**Jacob HARWOOD, Plaintiff,**

**v.**

**The HOWARD GROUP, INC., a Washington Corporation, Defendant.**

**The Howard Group, Inc., a Washington Corporation, Third–Party Plaintiff,**

**v.**

**Planning Committee for the Senior Class of Junction City High School 1997, an unincorporated association; Barbara L. Dussell; Arlene Rothenberger; Kathy Shear; and Kathy Johns, Third–Party Defendants.**

**No. Civ. 98–6364–TC.**

United States District Court, D. Oregon.

Jan. 14, 2000.

---

Robert G Ringo, Patrick L Hadlock, Ringo Stuber Ensor & Hadlock PC, Corvallis, OR, for Jacob Harwood.

Donald A Loomis, Loomis & Holland, Eugene, OR, for Howard Group Inc.

Louis L Kurtz, Joel DeVore, Luvaas Cobb Richards & Fraser, Eugene, OR, for Barbara L Dussell.

Philip R McConville, Brown Roseta Long McConville, Kilcullen & Carlson, Eugene, OR, for Arlene Rothenberger.

William E Flinn, Arnold Gallagher Saydack, Percell & Roberts PC, Eugene, OR, for Kathy Shear.

Thomas M Christ, Mitchell Lang & Smith, Portland, OR, for Kathy Johns.

## ORDER

COFFIN, United States Magistrate Judge.

This is a case that arises out of an injury suffered at an all-night party sponsored by parents for the 1997 senior class of Junction City (Oregon) High School.

As is typical with such graduation events throughout the state, parents raise funds throughout the year to pay for a structured, drug and alcohol-free evening of fun and games to commemorate the culmination of four years of high school and the

parting of ways for the seniors. Some parent committees arrange these functions by themselves. Others find it more convenient to contract with entities such as The Howard Group, Inc., (dba Grad Nights)[1], which for a fee lines up the facilities and schedules the activities for the event on behalf of the parents.

Arlene Rothenberger's son, Ty, was a member of the Junction City High 1997 graduating class. She learned that Grad Nights had recently been used by another local high school for its graduation party, and contacted a representative of Grad Nights for further information.

Based on that initial inquiry, Rothenberger apparently became the de facto representative of the parents' Planning Committee for the graduation party (hereinafter the Planning Committee) in the eyes of Grad Nights, even though Rothenberger held no title or position on the Planning Committee. Grad Nights thereafter mailed material to Rothenberger, which she passed on to Barbara Dussell, a member of and the treasurer for the Planning Committee.[2]

The Planning Committee was interested in using Grad Nights and decided to pursue it further. Although the Planning Committee never formally voted to select Grad Nights as the event's promoter, its inquiry spurred Grad Nights to draft a contract[3] on October 23, 1996, for promoting the event, which was to take place on June 6, 1997. The contract was signed on behalf of Grad Nights by one Marla Polenz, and mailed to Rothenberger for her signature (the preamble to the contract specifies that "this agreement is made the 23rd day of October 1996 between Grad Nights and Arlene Rothenberger representing the planning committee ...").

As noted previously, Rothenberger was essentially a mail-drop for the Planning Committee. She delivered the contract to Dussell without reading it.

Dussell for her part signed the contract on behalf of the Planning Committee. The contract specified that 5 payments totaling $13,200 were to be made to Grad Nights prior to the event. The payments were duly made. The contract further set forth that the Planning Committee was to provide a minimum number of chaperones for the party[4], detailed the activities and services Grad Nights was to provide, and contained an indemnity clause. A more detailed discussion of these issues will be set forth below.

On June 6, 1997, during the graduation night party, Jacob Harwood, a member of the senior class, was injured while engaging in an activity called "sumo wrestling," wherein the participants donned inflatable suits and bounced off or otherwise came into contact with each other on a mat. The suits, mat, and layout for the sumo wrestling activity were provided by Grad Nights. According to the complaint filed in this case by Harwood, his left knee was injured "by way of a tear of his fibular collateral ligament, a complete tear of his anterior cruciate ligament, a tear of his posterior cruciate ligament and extensive

---

1. As Grad Nights was the dba under which Howard Group operated in this case, I will use the former name to refer to the third-party plaintiff.

2. It should surprise no one who has ever been involved as a volunteer parent at an elementary or secondary school, that the Planning Committee was a loosely organized, informal, ad hoc group of parents who met sporadically to plan and raise funds for the graduation party. Dussell was never formally elected treasurer, but assumed that role by accounting for the receipt and disbursements of the funds.

3. The contract is found in the record as Exhibit 2 of document # 26.

4. The chaperone provisions are set out in paragraphs 24 and 25 of the contract. Although the Planning Committee was responsible for finding persons to serve as chaperones, Grad Nights specified certain qualifications for those chaperones, defined the chaperone duties and supervised the chaperones during the event.

injury to the peroneal nerve." As a result of these injuries, Harwood seeks in excess of $500,000 in damages from the Howard Group (Grad Nights).

According to the complaint, Grad Nights was negligent in the following ways causing plaintiff's injuries:

1) In failing to supply an area suitable in size and layout for the activity being pursued;

2) In failing to supply equipment for the game which was suitable for the activity being pursued;

3) In failing to supply a suitable mat which provided adequate footing for the activity being pursued;

4) In failing to properly supervise the student's activities.

Grad Nights has filed a third-party complaint against Rothenberger, Dussell, and several other purported members of the Planning Committee (Kathy Shear, Kathy Johns, and various unidentified John and Jane Does), asserting claims of indemnity and contribution. The indemnity claim is based upon the contractual indemnity clause and is being brought on all specifications of negligence. The contribution claim is connected to the fourth specification of negligence, and is based on the theory that members of the Planning Committee are vicariously liable for any negligence of the chaperones in supervising the students.

Presently before the court are third-party defendants Dussell's and Rothenberger's motions (# 23, # 29) for summary judgment.

### STANDARD OF REVIEW

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir.) *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

The moving party must carry the initial burden of proof. The party meets this burden by identifying portions of the record on file which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.* The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. *Id.*

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Insurance Co. of North America*, 638 F.2d 136, 140 (9th Cir.1981).

### CHOICE OF LAW

The contract was drafted by defendant Howard Group, a Washington corporation. It contains a choice of law provision in paragraph 23 by which the parties to the contract agreed that the law of the State of Washington would determine the parties' rights and liabilities under the contract. Therefore, the third-party plaintiff's indemnity claim must be decided under Washington law.

### INDEMNITY CLAIM

Dussell argues that the indemnity clause is unenforceable as a matter of law, be-

cause it is too broad and draconian and also because the Planning Committee is too loosely organized and informal to constitute a bona fide organization capable of entering into a binding contract. Rothenberger raises the additional argument that she never approved or ratified the contract and thus cannot be bound by the indemnity clause.

■ These contentions aside, even if the contract is binding in its entirety on Dussell, Rothenberger, and each and every member of the Planning Committee, such is of no avail to Grad Nights under the circumstances of this case for one very simple reason: sumo wrestling was *not* an activity or entertainment that was subject to the indemnity clause.

The indemnity clause is found in paragraph 20 of this 31 paragraph contract:

20. Purchaser agrees to name Grad Nights as an additional insured in any and all insurance policies secured by Purchaser or their agents, to provide liability coverage for this event. Purchaser agrees to indemnify, defend, assume liability for and hold Grad Nights harmless from any and all claims, damages, losses, and expenses by or to any person, regardless of the basis, which arise out of or are in any way incidental to the performance of Grad Nights, except as may be the result of Grad Nights' sole gross negligence.

But what was the "performance of Grad Nights" for which Dussell, on behalf of the Planning Committee, was agreeing to indemnify Grad Nights? The answer to that question is found in paragraph 29 of the contract:

29. Grad Nights agrees to provide the following entertainment and equipment:

1. Free play video games at LaserPort.

2. Go karts for two hours at Oaks Park.

3. Disk Jockey with sound system aboard the Portland Spirit.

4. Karaoke with disk jockey aboard the Porland Spirit.

5. Casino with 5 Blackjack tables aboard the Portland Spirit.

Thus a careful examination of the contract reveals that Dussell was accepting the risk of indemnifying Grad Nights for liability stemming from possible injuries to students from playing video games, driving go karts, listening, singing and dancing to music, and playing cards.

One might well have been willing to sign off as an indemnitor for such activities upon calculating that the risks were acceptable. But sumo wrestling was added to the entertainment to be provided without any addendum or written modification to the contract.

Grad Nights makes three arguments that the indemnity clause nonetheless still covers Harwood's injury.

First, Grad Nights contends that the Planning Committee was orally informed that sumo wrestling was to be added to the entertainment. The fatal counterpoint to this contention is found in paragraph 22 of the contract, which ironically, was drafted by Grad Nights:

*Additional Terms*

22. This agreement contains all terms and conditions agreed on by Purchaser and Grad Nights and no proposed options or other agreement, oral or otherwise regarding the subject matter of this contract, shall be deemed to exist or to bind any of the parties, nor shall this agreement be qualified or supplemented by course of dealing. No waiver or indulgence by Grad Nights of the deviation by Purchaser of any required performance shall be a waiver of Grad Nights' right to subsequent or other full and timely performance. This contract cannot be canceled except by mutual written consent of Grad Nights and Purchaser.

In other words, this was a fully integrated contract. The parties stipulated there were no side deals, and that the written contract could not be subsequently "quali-

fied or supplemented by course of dealing."

To reinforce this point, consider paragraphs 8 and 14 of the contract:

8. Only entertainers and entertainment listed in section 29 of this agreement will be provided at the event.

14. Grad Nights agrees to provide only the services set forth in this contract. No implied guarantee exists to indicate that Grad Nights will provide *all* the activities or services available at any specific facility during regular business hours. Use of some activities or services may be prohibited by state law and/or facility policy.

Thus, if Grad Nights had failed to provide sumo wrestling and the Planning Committee had sought a partial refund, citing its reliance on Grad Nights' oral representations, Grad Nights could invoke paragraphs 8, 14, 29, and 22 of the contract to defeat the claim. What is sauce for Grad Nights is sauce for the Planning Committee. Sumo wrestling was not an activity for which the Planning Committee contracted with Grad Nights.

Next, Grad Nights cites paragraph 12 to argue that the contract allowed for the addition of sumo wrestling:

12. Specific entertainers may be requested by Purchaser and reasonable efforts shall be made to provide requested entertainers. However, due to the advance dates of booking and the nature of the industry, Grad Nights can never guarantee the specific services of any one performer. *Grad Nights reserves the right at all times to substitute similar entertainers at its sole discretion.* (Emphasis added). Purchaser agrees that for a period of 24 months form (sic) the date of the event listed in this agreement, Purchaser nor their successors for future senior parties, may not directly or indirectly contract the services of the entertainers, vendors or facilities supplied under this agreement, except through Grad Nights. Grad Nights may assign or transfer any or all

of its rights, benefits, or duties under this agreement.

This language cannot be stretched as far as Grad Nights wants to take it. "Entertainers" is not synonymous with "entertainment." That this is so is made even more clear by paragraph 11:

11. Entertainers are made available for each event based upon their own performance schedules. Due to the advance dates of booking, it is impossible to guarantee exact times at which any one entertainer will be able to perform ...

While Grad Nights could substitute B.B. King for Muddy Waters, these clauses did not authorize the replacement of casino/blackjack with sumo wrestling. The addition of sumo wrestling was outside the scope of the contract.

Finally, Grad Nights contends that the Planning Committee agreed to indemnify it for "any and all claims ... which arise out of or are in any way incidental to the performance of Grad Nights ..." and thus is on the hook even if sumo wrestling was not a specified entertainment.

This is tantamount to saying that Dussell gave Grad Nights a blank check for the evening: bungee jumping, kick-boxing, motorcycle racing, tightrope walking,— Grad Nights had unfettered discretion with respect to the activities to be performed and unfettered indemnity for its own negligence in connection with whatever activities it threw into the mix.

The circumstances of this case highlight the boldness of Grad Nights' interpretation of the contract: three of the four claims of negligence advanced by Harwood involve matters within the sole control of Grad Nights: it is alleged that the size and layout of the area was unsuitable for sumo wrestling, that the equipment (inflatable suits) was not adequate, and that the mat was unsafe. The Planning Committee had no ability to reduce or even address the risks associated with any of this, not having been informed through the contract that it was "purchasing" this activity.

As third-party defendant Dussell points out in her brief, Oregon and Washington

apply similar standards in assessing the enforceability of an indemnity provision. Grad Nights agrees that "the law in Oregon and Washington on this subject is similar." (# 29, pages 7–8). Both states raise the bar fairly high:

... clauses which purport to exculpate an indemnitee from liability for losses flowing solely from his own acts or omissions are not favored and are to be clearly drawn and strictly construed, with any doubts therein to be settled in favor of the indemnitor. *Northwest Airlines v. Hughes Air Corporation,* 37 Wash.App. 344, 347, 679 P.2d 968 (1984). It is a firmly established rule that contracts of indemnity will not be construed to cover losses to the indemnitee caused by his own negligence unless such intention is expressed in clear and unequivocal terms. *Southern Pacific Co. v. Layman,* 173 Or. 275, 279, 145 P.2d 295 (1944).

■ Applying those standards to the contract herein, it must be concluded that not only did the contract fail to express in clear and unequivocal terms that the Planning Committee was indemnifying Grad Nights for any loss or claims stemming from the sumo wrestling activity, any fair reading of the contract points to the opposite construct. The Committee may well have agreed to indemnify Grad Nights for any claim arising out of the "performance" of video games, go karts, dancing to the tunes of a disk jockey, singing at karaoke, and playing casino games, but not some unspecified activity like wrestling. Grad Nights cannot hide the risk-pea in the shell of paragraph 29 (which it drafted) and then claim the benefit of a limitless indemnity clause (which it likewise drafted) to transfer liability for its own negligence onto the Planning Committee. The indemnity clause should not be read in isolation; in context it is defined and limited by other portions of the contract. *Northwest Airlines,* 37 Wash.App. at 346, 679 P.2d 968; *Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc.,* 120 Wash.2d 573, 844 P.2d 428 (1993). Those other portions make it clear that the Com-

mittee was assuming the risk of indemnifying for only the activities specified in the contract. *See also Jones v. Strom Construction Co., Inc.,* 84 Wash.2d 518, 527 P.2d 1115 (1974).

Thus summary judgment is granted in favor of Dussell and Rothenberger on the indemnity claims against them.

Although my findings on the interpretation of the contractual provisions at issue render it unnecessary to address the alternative grounds asserted for summary judgment, I will do so briefly.

First, the court rejects Dussell's argument that the Planning Committee was not a bona fide organization capable of contracting with Grad Nights. It was and it did.

Next, I agree with Rothenberger that neither she nor any other non-signatory member of the Committee assented to or ratified Grad Nights' interpretation of the contractual provision at issue herein. Assuming, *arguendo,* that a parent's knowledge that a promoter has been hired to stage the activity coupled with the decision to send a son or daughter to the party puts the parent on notice that a contract exists and obligates the parent to make some sort of reasonable inquiry into the contract, no *reasonable* inquiry would have revealed that the parent was thus agreeing to indemnify Grad Nights for liability incurred in connection with sumo wrestling.

Third, the interpretation of the indemnity provision advocated by Grad Nights borders on the unconscionable.

■ The law and rules of construction pertaining to indemnity provisions are designed to mitigate against unfair and unforeseen results. *McCutcheon v. United Homes Corp.,* 79 Wash.2d 443, 486 P.2d 1093 (1971). The indemnity clause of this contract is not a black hole into which all parents collapsed once they ventured into a Planning Committee meeting room and learned that Grad Nights had been hired as promoter. Moreover:

1) Barbara Dussell was a volunteer parent with no sophistication in negotiating a

business contract when she executed the agreement on behalf of the Planning Committee. In contrast, Grad Nights is organized to engage in the particular type of activity (staging graduation parties) for a profit and as a business venture.

2) The indemnity clause was not negotiated, but was part of a form contract drafted entirely by Grad Nights. The indemnity clause is not highlighted in any way, and is found buried roughly two-thirds of the way into the document.

3) The Planning Committee could not have discovered the scope of their liability based on a careful reading of the contract.

4) Grad Nights was in sole and exclusive control of the allegedly defective equipment and layout for the wrestling activity. The parents had no ability to control the sumo wrestling site, equipment, or conduct of the activity.

Thus, for a multiple choice of reasons, the third-party defendants' motions for summary judgment are granted on the indemnity claims.

### COMMON LAW CONTRIBUTION CLAIM

The third-party defendants appear to concede that Oregon law supports a claim for common law contribution. Contribution claims in Oregon are governed by ORS § 18.440 [5]. The statute provides that

> where two or more persons become jointly or severally liable in tort for the same injury to person or property, ... there is a right of contribution among them.... There is no right of contribution from a person who is not liable in tort to the claimant. ORS § 18.440(1).

Further, the "right of contribution exists only in favor of a tortfeasor who has paid more than a proportional share of the common liability." ORS § 18.440(2). Howev-

er, where "one tortfeasor is entitled to indemnity from another, the right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee." ORS § 18.440(5).

Under the statute, Grad Nights must show that the third-party defendants are liable to Jacob Harwood. Assuming that Grad Nights' claim is not premature and can be brought against a person who is not the subject of an action by the plaintiff, Grad Nights must show that the third-party defendants were negligent in their conduct toward Jacob Harwood, and that the negligence was a cause of Harwood's injury.

Since Dussell and Rothenberger were not present at the graduation party when Harwood was injured, Grad Nights attempts to raise a factual dispute concerning liability by asserting a theory of *respondeat superior*, that is, that the third-party defendants are liable for the conduct of the chaperones. This necessarily means that Grad Nights must show that the chaperones were negligent. Grad Nights has presented no evidence from which a rational factfinder could infer negligence on the part of the chaperones. Therefore, the contribution claim must fail.

■ This claim fails for another, more fundamental reason. Grad Nights has failed to show that the Planning Committee can be held liable for any actions by the chaperones. In order to prevail on a theory of *respondeat superior*, Grad Nights must show that the Planning Committee had the right to control the actions of the chaperones.

Under the contract, the Planning Committee's duty with respect to chaperones was to find 15 volunteers to act as chaperones, with at least one of the 15 being an off-duty police officer [6]. The duties of the

---

**5.** Oregon law does provide a cause of action for common law indemnity. *Smith v. Urich,* 151 Or.App. 40, 947 P.2d 1125 (1997). However, the analysis in this case is not affected by the designation of the claim since both

claims share the common element of a showing of liability on the part of the indemnitor.

**6.** This was the only specified criteria for selection of the chaperones, and it was required by Grad Nights.

chaperones were entirely controlled by Grad Nights, and Grad Nights was responsible for supervising the chaperones during the graduation party and training them for any particular tasks to which the chaperones were assigned during the party. There is no evidence that the Planning Committee did control or could have controlled the chaperones while those chaperones were performing their tasks as assigned by Grad Nights. Therefore, even if Grad Nights could present evidence of negligent conduct on the part of the chaperones, the contribution claims would fail.

### CONCLUSION

For the above stated reasons, third-party defendants' motions (# 23, # 29) for summary judgment are granted.